UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DAKARAI LARRIETT,

       Plaintiff,

v.                                                                         CASE No. 1:24-cv-1039

                                           HON. ROBERT J. JONKER

MICHIGAN DEPARTMENT OF
STATE POLICE, et al.,

       Defendants.

_____/

## OPINION AND ORDER

### INTRODUCTION

Not every sober person arrested on suspicion of intoxicated driving has a valid Fourth Amendment claim. The Fourth Amendment protects citizens from unreasonable arrests but it "does not guarantee that only the guilty will be arrested." *Baker v. McCollan,* 443 U.S. 137, 145 (1979). Reasonable suspicion and probable cause provide standards that sort out the propriety of particular stops and arrests.

Mr. Larriett brings this civil rights lawsuit alleging that Michigan State troopers stopped and arrested him based on hostility to his race and sexual orientation and not based on a fair assessment of the observed facts. He also cites the negative results of the eventual blood draw to support his position. Mr. Larriett's raw allegations are disturbing. But there is more in this case than the blood draw and Mr. Larriett's report of the encounter with the troopers. There is dash and body camera footage that captures the entire interaction between the troopers and Mr. Larriett.

And based on this extensive audio and video, the troopers move for dismissal based on qualified immunity.  The State Police as a Department moves to dismiss based on sovereign immunity.

The Court has reviewed the entirety of the dash and body camera footage.  The footage reveals that what actually happened between Mr. Larriett and the troopers is not the way Mr. Larriett remembers it.  Based on the camera footage showing what actually happened, the defense is entitled to the relief it seeks.

## FACTUAL BACKGROUND

### 1. Scope of Materials Considered

At the outset the Court must address what it may consider under its Rule 12 review.   Mr. Larriett's complaint itself contains little by way of factual allegations.  And what is alleged is largely conclusory.  He fills in the gaps by reference to various exhibits attached both to the complaint and response to the defense motion.  Both sides also present the recording of the dash camera on the troopers' patrol vehicle as an exhibit.  The defense further submits the body camera video of Trooper Kanyuh—the primary officer involved.  Mr. Larriett adds the body camera footage of Trooper Okaiye, who performed a secondary role, as an exhibit.

Ordinarily a court assesses the sufficiency of a complaint without resort to matters outside the pleadings.  *Gavitt v. Born*, 835 F.3d 623, 640 (6th Cir. 2016) (*citing Wysocki v. Int'l Bus. Mach. Corp.*, 607 F.3d 1102, 1104 (6th Cir. 2010)).  "However, a court may consider exhibits attached to the complaint, public records, items appearing in the record of the case, and exhibits attached to defendant's motion to dismiss, so long as they are referred to in the complaint and are central to the claims contained therein, without converting the motion to one for summary judgment."  *Id.* (citing cases).  In addition, the Sixth Circuit recently has made clear that district courts may consider video evidence in deciding qualified immunity issues at the motion to dismiss stage:

> In qualified-immunity cases, we've previously considered videos at
> the motion-to-dismiss stage. *See, e.g., Bailey v. City of Ann Arbor*,
> 860 F.3d 382, 387 (6th Cir. 2017).  And for good reason.  Qualified
> immunity isn't just a defense to liability—it's immunity from the
> costs and burdens of suit in the first place. *Scott v. Harris*, 550 U.S.
> 372, 376 n.2 (2007); *Pearson v. Callahan*, 555 U.S. 223, 237 (2009).
> If officers are entitled to qualified immunity and don't receive it at
> the earliest possible stage, then they lose its protections for as long
> as they continue to litigate. *Crawford v. Tilley*, 15 F.4th 752, 763
> (6th Cir. 2021) (highlighting the importance of applying qualified
> immunity even before discovery); see *Scott*, 550 U.S. at 376 n.2. So
> when uncontroverted video evidence easily resolves a case, we
> honor qualified immunity's principles by considering the videos.

*Bell v. City of Southfield*, 37 F.4th 362, 364 (6th Cir. 2022); *see also Akima v. Peca*, 85 F.4th 416,

423 n.3 (6th Cir. 2023) (considering video evidence available to the motion to dismiss).

The court's use of the videos, however, is limited at this stage.  "If there is a factual dispute

between the parties [the court] can only rely on the videos over the complaint to the degree the

videos are clear and 'blatantly contradict[ ]" or "utterly discredit[ ]" the plaintiff's version of

events."   *Bell*, 37 F.4th at 364 (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)) (second and

third brackets in *Bell*).   "This is because if a video clearly depicts a set of facts contrary to those

alleged in the complaint, this makes a plaintiff's allegations implausible."  *Saalim v. Walmart,

Inc.*, 97 F.4th 995, 1002 (6th Cir. 2024) (citing *Bailey v. City of Ann Arbor*, 860, F.3d 372, 387

(6th Cir. 2017)).   So, "when the video does not blatantly contradict or utterly discredit the

complaint" a court must "rely on the allegations in the pleadings alone."  *Id.*   As discussed further

below the Court determines the video footage in this case blatantly contradicts the allegations in

the Complaint in a number of key respects.

Based on this authority, the Court considers the materials attached to the Complaint; Mr.

Larriett's affidavits; the dash camera footage; and the two body camera recordings.  The added

wrinkle, however, is that in the briefing and affidavits Mr. Larriett repeatedly asserts that the

recordings have somehow been tampered with. (ECF No. 32, PageID.133-134, 145). The conclusory assertions fail to persuade the Court that it must ignore the videos. Indeed, Mr. Larriett does not claim that the Court must ignore them; to the contrary, he asks the Court to consider them. The Court is eminently satisfied after its own review that the videos are reliable records of what happened. There are certain redactions to protect personal identifying information—but nothing else. Critically the video footage does not appear to contain any sudden stops, jumps, or time gaps. And those portions of the recordings that have blurred redactions maintain a consistent running clock..

When the Supreme Court in *Scott* held that videotaped evidence may "utterly discredit[ ]" contrary averments on summary judgment, it observed that "[t]here [were] no allegations or indications that [the] videotape was doctored or altered in any way, nor any contention that what it depicts differs from what actually happened," *Scott*, 550 U.S. at 378, by the non-moving party. In this case Mr. Larriett does not detail how what is depicted on the recordings differs from what he says actually happened. At most he offers a hearsay statement about a conversation between Trooper Okaiye and his passenger about his vehicle's ownership and his conclusory belief that part of Trooper Okaiye's body camera footage seems altered. (Larriett Aff. ¶¶ 4, 9(b), ECF No. 32-2, PageID.149, 151). The Court accepts for present purposes the conversation that Mr. Larriett alleges took place between Trooper Okaiye and the passenger, which merely repeats the allegations in the Complaint. Beyond that the Court does not believe that Mr. Larriett has pointed to anything beyond routine redactions of matters that are not material to the issues for decision. *See Rodriguez v. New Jersey*, No. CV 18-11166, 2021 WL 165106, at *1 (D.N.J. Jan. 19, 2021) (rejecting the plaintiff's conclusory argument that the video has been edited); *Leach v. D.C.,* No. 19-CV-947 (APM), 2023 WL 2645707, at *6 (D.D.C. Mar. 27, 2023) (denying motion for

reconsideration where the plaintiff alleged, inter alia, that body camera footage had been redacted and altered where the plaintiff did "not identified any specific instance in the video evidence upon which the court relied that appears doctored or altered in any way.").  Accordingly, the Court considers the video exhibits consistent with *Scott v. Harris*; *Bell v. City of Southfield*; and *Saalim v. Walmart, Inc*.

### 2.  *The Initial Stop*

The Complaint alleges that on April 10, 2024, Mr. Larriett was driving his Cadillac SUV in Benton Harbor, Michigan.  (Compl. ¶ 7, ECF No. 1).  Mr. Larriett says that he was pulled over by Troopers Kanyuh and Okaiye even though he had not committed any traffic violation.  (*Id.* at ¶ 8).  He avers that Trooper Kanyuh told him that he failed to come to a complete stop at a red light; but he argues that his passenger can confirm that Mr. Larriett had come to a complete stop. (First Larriett Aff. ¶ 3, ECF No. 1-1, PageID.11).

Video footage of the patrol car's dash camera, however, blatantly contradicts this allegation.  The dash camera footage shows that at around 3:09 a.m. on the morning of April 10, 2024, Mr. Larriett's SUV failed to make a complete stop at a red stoplight and instead rolled through the red light while making a right turn.  Trooper Kanyuh, who was driving the marked patrol vehicle, performed a traffic stop approximately one minute later.

### 3.  *The Detention for Field Sobriety Testing*

Trooper Kanyuh's body camera footage shows that after making the stop, the trooper approached the driver's side of the vehicle and asked for Mr. Larriett's driver's license, registration, and insurance paperwork.  Trooper Okaiye's recording shows that he walked up on the passenger side of the SUV and spoke with the vehicle's passenger.

Trooper Kanyuh's body camera footage demonstrates that Mr. Larriett provided his license and what the trooper said were expired copies of his registration and insurance to Trooper Kanyuh. The trooper then asked Mr. Larriett whether alcohol was affecting his ability to drive that day.  Mr. Larriett responded in the negative, and the trooper proceeded to ask when Mr. Larriett had last had a drink.  Mr. Larriett did not immediately respond to this question, and so the trooper asked whether it had been at least two hours.  Trooper Kanyuh's body camera footage shows that Mr. Larriett nodded his head in the affirmative and that he responded "yeah."  The trooper then asked for more detail—he asked Mr. Larriett to confirm that it had been more than two hours since his last drink and asked what specifically Mr. Larriett had drunk.  The trooper commented that he was smelling something "fruity" and something "else"—perhaps marijuana—coming from the vehicle.  Mr. Larriett responded that there was no alcohol, but the trooper replied that he could smell it on Mr. Larriett's breath.  Trooper Kanyuh asked again what Mr. Larriett had been drinking.  Mr. Larriett repeated that there was no alcohol and reiterated that point when the trooper asked again whether it had been at least two hours.

Trooper Kanyuh then asked Mr. Larriett to step out of the SUV and the two spoke at the back of the vehicle.  Trooper Kanyuh asked Mr. Larriett why he was changing his story—noting that Mr. Larriett had first said it had been at least two hours since his last drink; that the trooper could smell alcohol on his breath; and now Mr. Larriett was denying it all.  Mr. Larriett said he was not going to comment any further, but he again denied having any alcohol.

### 4.  *Field Testing*

Trooper Kanyuh then asked Mr. Larriett to step off to the side of the road onto a flat surface. He asked several questions, including whether Mr. Larriett had taken any medications.  Mr. Larriett responded he was on medications but refused to disclose what medications he was taking.

Mr. Larriett alleges that he was then subjected to a series of sobriety tests in a cold and dark alley. He avers that he was wearing pajamas which were not suitable attire for the cold and dark conditions.  (First Larriett Aff. ¶ 6, ECF No. 1-1, PageID.11).  He states that Trooper Kanyuh conducted a series of tests including the alphabet test; a numbers countdown; nose touches; and a heel to toe walk.  (*Id.*).  The video shows the administration of these tests.  At the end of the tests the trooper and Mr. Larriett walked back to their vehicles.  At this point Mr. Larriett again denied consuming any alcohol and he also responded in the negative when asked if he had consumed marijuana.

In the briefing, Mr. Larriett claims that he passed every test that was administered to him. (ECF No. 32, PageID.132).  And he further avers that after administering the tests, Trooper Kanyuh searched through his patrol vehicle to find drugs to plant in his SUV.  He grounds his belief in his claim that that after Trooper Kanyuh had completed his tests, Trooper Okaiye walked to the back of the patrol vehicle where Trooper Kanyuh was searching through the trunk and referred to "drugs" to which Trooper Kanyuh responded that he didn't think he had any, but that he had a stash somewhere.  (Second Larriett Aff. ¶ 9(b), ECF No. 32-2, PageID.151).

The video blatantly contradicts Mr. Larriett's allegations as to this series of events in several respects.  As to the field sobriety tests, Trooper Kanyuh's body camera plainly and unambiguously reflects that Mr. Larriett stopped well short when asked to count down from 99 to 81.  And the body cameras of the two troopers further clearly and unmistakably shows that Trooper Okaiye asked Trooper Kanyuh whether he was looking for "straws"—not drugs—when walking back to their patrol vehicle.  It is undisputed that the troopers did not administer a breathalyzer, or PBT, to Mr. Larriett during the stop.

### *5.  Decision to Arrest*

Trooper Kanyuh returned to his vehicle while Trooper Okaiye spoke with Mr. Larriett.  Mr. Larriett avers that the trooper asked irrelevant questions about the length of time that he had owned the SUV; Mr. Larriett's career; education; and community questions.  He alleges Troope Kanyuh asked similar irrelevant questions.  (First Larriett Aff. ¶¶ 5, 9, ECF No. 1-1, PageID.11, 12).  After speaking with Mr. Larriett, Trooper Okaiye went over to Trooper Kanyuh where the two troopers conferred.  Body camera footage shows that the two troopers concluded that a combination of alcohol, marijuana, and prescription medication was impairing Mr. Larriett's ability to drive.  Trooper Kanyuh said there were "numerous clues" from the sobriety testing.  Among other things, the trooper singled out Mr. Larriett's toe and heel test; commented the finger to nose test was "terrible," and noted that Mr. Larriett had stopped short on the countdown test.  The two troopers also commented on Mr. Larriett's behavior—noting that he had divided attention and that he looked away and moved his head when he was spoken too.  Trooper Kanyuh decided to place Mr. Larriett under arrest.

### *6.  Arrest and Blood Draw*

Trooper Kanyuh then told Mr. Larriett that he was under arrest.  The trooper mentioned the moving violations as the basis for the initial stop; that he detected alcohol when first speaking with Mr. Larriett; and that Mr. Larriett changed his story regarding alcohol consumption.  Mr. Larriett denied committing a moving infraction and further denied having changed his story.  He avers that the trooper misconstrued the conversation, and that he explained to Trooper Kanyuh that the trooper had introduced a misleading two-hour qualification.  (First Larriett Aff. ¶ 7, ECF No. 1-1, PageID.11).  The trooper responded that based on his observations from the field testing, he had concluded that Mr. Larriett was under the influence while driving.

Trooper Kanyuh then told Mr. Larriett that he needed to be brought in for a blood draw, and to spend time in detox.  Mr. Larriett says he was pressured into consenting to a blood draw because he was told that if he did not submit to the test he would receive six points on his license; but there is no dispute that Mr. Larriett did consent to a blood draw.

Mr. Larriett avers that he was transported to the hospital for the blood draw and then to the Berrien County Jail.  (First Larriett Aff. ¶¶ 12-13, ECF No. 1-1, PageID.12).  At the jail, Mr. Larriett says a booking officer told him that it was unusual for someone to be detained based on such light evidence.  (*Id.* at ¶ 16).  He says he underwent multiple scans at the jail by an apparent trainee who also struggled to obtain his fingerprints.  Mr. Larriett further avers that what was an "anomaly" during one x-ray turned out to be gas bubbles; but in the meantime Trooper Kanyuh accused him of swallowing a bag of drugs and Mr. Larriett was compelled to defecate in public while the trooper rudely ordered him not to flush.  (*Id.* at ¶¶ 13-15; Second Larriett Aff. ¶ 5, ECF No. 32-2, PageID.149)).

At some point Mr. Larriett was informed that he had passed an alcohol test, but he says he was nevertheless required to spend several subsequent hours at the jail purportedly to sober up even though he was not intoxicated.  He was released around noon on April 10.  (First Larriett Aff. ¶ 18, ECF No. 1-1, PageID.13).  The next day, April 11, Mr. Larriett went to an urgent care clinic for a drug test.  He avers that the results of that test showed he was negative for all drugs, including marijuana.  (*Id.* at ¶ 20).

## PROCEDURAL HISTORY

Mr. Larriett brought this lawsuit against the Michigan State Police and Troopers Kanyuh and Okaiye on October 2, 2024.  (ECF No. 1).  He alleges that he was stopped and arrested without probable cause, and that he was the victim of racially discriminatory policing that he further

contends is part of a policy and practice by the Michigan State Police.  He believes that his sexual orientation further contributed to the officers' actions that night.  He brings six claims for relief, as follows:

> Count I   – Violation of Fourth Amendment Rights Under 42 U.S.C. § 1983
>
> Count II   – Violation of Fourteenth Amendment Equal Protection Rights Under 42 U.S.C. § 1983
>
> Count III – Violation of Civil Rights Under 42 U.S.C. § 1981
>
> Count IV – Malicious Prosecution
>
> Count V   – False Arrest and Imprisonment
>
> Count VI – Intentional Infliction of Emotional Distress

(ECF No. 1).

On January 14, 2025, the defendants filed the instant Rule 12 motion to dismiss.  (ECF No. 12).  Mr. Larriett responded in opposition on February 18, 2025 (ECF No. 32) and the defense has replied.  (ECF No. 28).  The matter is ready for decision.

## LEGAL STANDARDS

Federal Rule of Civil Procedure Rule 12(b)(1) allows a defendant to seek dismissal for lack of subject-matter jurisdiction.  Under Rule 12(b)(6) a claim must be dismissed for failure to state a claim on which relief may be granted unless the "[f]actual allegations [are] enough to raise a right to relief above the speculative level on the assumption that all of the complaint's allegations are true." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 545 (2007).  As the Supreme Court more recently held, to survive a motion to dismiss, a complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009).  This plausibility standard "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." If the complaint

simply pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'"  *Id.*

## DISCUSSION

### 1. *Supplemental Jurisdiction*

Counts III through VI are plead as state law claims.[1]  Federal question jurisdiction under 28 U.S.C. §§ 1331 and 1343 is the only basis for subject matter jurisdiction invoked in his case and so supplemental jurisdiction under Section 1367 provides the basis for jurisdiction over these three state law claims.  The Court declines the exercise of supplemental jurisdiction.

Courts may exercise supplemental jurisdiction "over all other claims that are so related to claims . . . within . . . original jurisdiction that they form part of the same case or controversy under Article III." 28 U.S.C. § 1367(a).  A claim is part of the same case or controversy as a claim with original jurisdiction if the two "derive from a common nucleus of operative fact such that the relationship between the federal claim and the state claim permits the conclusion that the entire action before the court comprises but one constitutional case." *City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 165 (1997) (internal quotation marks omitted).  Courts may decline to exercise supplemental jurisdiction when:

1.  the claim raises a novel or complex issue of State law,

2.  the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,

---

[1] The Complaint is not a model of clarity.  Counts IV and V are asserted as claims for "malicious prosecution" and "false arrest and imprisonment."  Count VI, raises a claim for intentional infliction of emotional distress which plainly is a state law claim.  Michigan law is expressly invoked in Count IV as well (even though Mr. Larriett confusingly cites to Section 1983 in discussing this claim in the briefing).  To the extent Plaintiff intends to bring a federal malicious prosecution and false arrest claim in these two counts, such a claim is fully encompassed by the Fourth Amendment claim in Count I, and thus those claims are redundant to those in Count I.

3. the district court has dismissed all claims over which it has original jurisdiction, or

4. in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c).  Courts have "broad discretion in deciding whether to exercise supplemental jurisdiction over state law claims." *Pinney Dock & Transp. Co. v. Penn Central Corp.*, 196 F.3d 617, 620 (6th Cir. 1999) (internal quotation omitted).

The claims in this case may derive from a "common nucleus of operative fact," but the Court finds that an exercise of supplemental jurisdiction over the state claims is not appropriate here.  State law claims against a state entity and its employees raise important concerns regarding separate sovereigns.  Retaining the state law claims would place this federal court in an unfitting position of directing a state on how to comply with its own law.   Furthermore, although the state law claims may contain some overlapping issues with the federal claims, they differ in fundamental ways that would require separate proofs, separate instructions, separate damage theories, and separate immunity analyses.  Moreover, the Court determines all the federal claims should be dismissed.  Accordingly, the Court declines to exercise supplemental jurisdiction over the state law claims in Counts IV through VI. Those claims are dismissed without prejudice.

### 2.  *The Michigan State Police is Entitled to Eleventh Amendment Immunity*

Defendant Michigan Department of State Police contends it is entitled to Eleventh Amendment immunity on Counts I through III.  Rules 12(b)(1) and 12(b)(6) are recognized as appropriate grounds for dismissing claims barred by Eleventh Amendment immunity.  *Nali v. Whitbeck*, No. 1:07-CV-544, 2008 WL 5381818, at *5 n.3 (W.D. Mich. Dec. 22, 2008).

Regardless of the form of relief requested, the states and their departments are immune under the Eleventh Amendment from suit in the federal courts, unless the state has waived

immunity, or Congress has expressly abrogated Eleventh Amendment immunity by statute.  *See
Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 98–101 (1984); *Alabama v. Pugh*, 438
U.S. 781, 782 (1978); *O'Hara v. Wigginton*, 24 F.3d 823, 826 (6th Cir. 1994).  Congress has not
expressly abrogated Eleventh Amendment immunity by statute, *Quern v. Jordan*, 440 U.S. 332,
341 (1979), and the State of Michigan has not consented to civil rights suits in federal court.  *Abick
v. Michigan*, 803 F.2d 874, 877 (6th Cir. 1986).  In numerous decisions, the Sixth Circuit Court of
Appeals and district courts in Michigan have held that the Michigan State Police is an agency of
the State of Michigan, protected by sovereign immunity.  *See Lavrack v. City of Oak Park*, No.
98-1142, 1999 WL 801562, at *2 (6th Cir. Sept. 28, 1999); *see also Scott v. Michigan*, 173 F.
Supp. 2d 708, 714 (E.D. Mich. 2001) (finding the Michigan State Police is an arm of the State of
Michigan entitled to Eleventh Amendment immunity); *Jones v. Robinson,* No. 12-12541, 2012
U.S. Dist. LEXIS 113652, at *8, (E.D. Mich. Aug.13, 2012) (also finding Michigan State Police
Department is a state agency immune from suit under § 1983); *Haddad v. Fromson*, 154 F. Supp.
2d 1085, 1091 (W.D. Mich. 2001) (explaining that the Michigan State Police is a department of
the State of Michigan "created by statute," and is thus entitled to Eleventh Amendment immunity)
(citing Mich. Comp. Laws § 16.250)), *overruled on other grounds*, *Lapides v. Bd. of Regents of
the Univ. Sys. of Georgia*, 535 U.S. 613 (2002); *Gavitt v. Ionia Cnty.*, No. 14-12164, 2014 WL
7157187, at *16 (E.D. Mich. Dec. 15, 2014) (finding *Monell* claim against Michigan State Police
Department barred by Eleventh Amendment immunity).  Moreover, the Sixth Circuit has observed
that the Michigan State Police is not a "person" subject to suit under § 1983. *Lavrack,* 1999 WL
801562 at *2 (*citing Howlett v. Rose,* 496 U.S. 356, 383 (1990))*.*

        For these reasons, the Michigan Department of State Police is properly dismissed on
grounds of immunity and for failure to state a claim.  Furthermore, the official capacity claims

against the two troopers are properly dismissed as redundant to the claims against the police department.  *See Foster v. Michigan*, 573 F. App'x 377, 390 (6th Cir. 2014) (finding official-capacity suits against defendant agency's employees superfluous where the state and agency were also named as defendants).

### 3.  *Claims Against Defendants Kanyuh and Okaiye*

Mr. Larriett brings two claims under 42 U.S.C. § 1983.  In Count I, he claims that he was deprived of his right to be free from unreasonable searches and seizures as guaranteed by the Fourth Amendment to the United States Constitution.  In this claim Mr. Larriett challenges several decision points beginning with the initial traffic stop and carrying through to his detention at the jail.  The second claim brought under Section 1983 in Count II is that the defendant troopers allegedly subjected Mr. Larriett to racial and sexual orientation profiling constituting selective enforcement of the law in violation of the Equal Protection Clause of the Fourteenth Amendment. Finally, in Count III, Mr. Larriett brings a claim under 42 U.S.C. § 1981 that the troopers intentionally discriminated against him based on his race and sexual orientation that subjected him to unequal treatment under the law.  This count is "closely intertwined" with the selective enforcement claim brought in Count II.  *See Cunningham v. Sisk*, No. 1:01-CV-182, 2003 WL 23471541, at *5 (E.D. Tenn. Dec. 4, 2003) (Edgar, J.).

Defendants move to dismiss primarily on grounds of qualified immunity and failure to state a *Twombly* plausible claim.[2]

---

[2] Defendants also argue the Complaint violates Rule 8 because it is largely conclusory and fails to distinguish the complained of conduct that is alleged between the two troopers. (ECF No. 20, PageID.68-70).  To be sure, the Complaint is scant on detail.  And the Sixth Circuit Court of Appeals "'has consistently held that damage claims against government officials arising from alleged violations of constitutional rights must allege, with particularity, facts that demonstrate what *each* defendant did to violate the asserted constitutional right.'"  *Marcilis v. Twp. of Redford*, 693 F.3d 589, 596 (6th Cir. 2012) (quoting *Lanman v. Hinson*, 529 F.3d 673, 684 (6th Cir. 2008))

## A.  Section 1983 Fourth and Fourteenth Amendment Claims

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege the violation of a right secured by the federal Constitution or laws and must show that the deprivation was committed by a person acting under color of state law.  *West v. Atkins*, 487 U.S. 42, 48 (1988); *Street v. Corr. Corp. of Am.*, 102 F.3d 810, 814 (6th Cir. 1996).  Because § 1983 is a method for vindicating federal rights, not a source of substantive rights itself, the first step in an action under § 1983 is to identify the specific constitutional right allegedly infringed.  *Albright v. Oliver*, 510 U.S. 266, 271 (1994).  The focus here is on whether Mr. Larriett has sufficiently alleged a Fourth and Fourteenth Amendment violation under Section 1983 and whether the troopers are entitled to qualified immunity on those claims.

The doctrine of qualified immunity provides that government officials performing discretionary functions are generally shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional right of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Dietrich v. Burrows*, 167 F.3d 1007, 1012 (6th Cir. 1999).  An "objective legal reasonableness" test is used to determine whether the official could reasonably have believed his conduct was lawful. *Anderson v. Creighton*, 483 U.S. 635, 639 (1987).  The qualified immunity inquiry requires a court to decide whether the facts as alleged or shown make out a constitutional violation and whether the right that was allegedly violated was a clearly established right at the time of the alleged misconduct.  *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). If the court can conclude either that no constitutional violation occurred or that the right was not clearly established, qualified immunity

---

(emphasis in original).  However on this record, which includes exhibits attached to the Complaint, the Court is satisfied that dismissal for failure to comply with Rule 8's basic pleading requirements is not warranted.

is warranted.  The court may consider either prong of the inquiry without regard to sequence.  *Id.* at 236.

Although the Sixth Circuit has observed that "it is generally inappropriate for a district court to grant a 12(b)(6) motion to dismiss on the basis of qualified immunity," *Wesley v. Campbell*, 779 F.3d 421, 433–44 (6th Cir. 2015), it has also said that when "pleadings in th[e] case are not ambiguous," and "it is clear that no violation of a clearly established constitutional right could be found under any set of facts that could be proven consistent with the allegations or pleadings," the Court acts well within its discretion in granting a pre-answer motion to dismiss on the basis of qualified immunity. *Jackson v. Schultz*, 429 F.3d 586, 589–90 (6th Cir. 2005).

## I.      Qualified Immunity – Fourth Amendment Claims

In Count I Mr. Larriett asserts that the two troopers—unquestionably persons "acting under color of state law" during the traffic stop—violated his Fourth Amendment constitutional rights. However he labels his claims, Mr. Larriett identifies three decision points that he claims are unlawful: first, the decision to perform the initial traffic stop; second, the decision to extend the stop to detain him for field sobriety tests; and third, the decision to arrest him based on the results of those tests.[3]  The Court addresses each in turn.

### i.      Traffic Stop

Mr. Larriett first challenges the lawfulness of the initial traffic stop.  "It is true that '[t]he temporary stop and detention of a vehicle and its passengers, even for a brief period of time, can constitute an unlawful 'seizure' under the Fourth Amendment." *Cunningham v. Sisk*, 136 F. App'x

---

[3] At various points Mr. Larriett identities arguments relating to an unreasonable search and seizure; an arrest without probable cause; and unlawful detention along with labels of false arrest and malicious prosecution.  While these claims are distinct, they all arise under the Fourth Amendment, and are fully encompassed by the discussion here.

771, 774 (6th Cir. 2005) (quoting *United States v. Copeland*, 321 F.3d 582, 592 (6th Cir. 2003)) (alteration in *Sisk*). "But such a seizure is not unlawful and does not violate the Fourth Amendment 'where the police have probable cause to believe a traffic violation has occurred.'" *Id.* (quoting *Whren v. United States*, 517 U.S. 806, 810 (1996)). Put differently, "[a]n officer may stop and detain a motorist without contravening the Fourth Amendment's prohibition against unreasonable searches and seizures 'so long as the officer has probable cause to believe that the motorist has violated a traffic law.'" *Green v. Throckmorton*, 681 F.3d 853, 860 (6th Cir. 2012) (quoting *United States v. Bell*, 444 F.3d 535, 539 (6th Cir. 2009)). Mr. Larriett contends he did not violate any traffic law, but the troopers' dash camera clearly and blatantly contradicts this allegation. The footage shows that Mr. Larriett rolled through a red light when making a right turn without coming to a complete stop. Failure to do so is a violation of Michigan traffic law. *See* MICH. COMP. LAWS § 257.612(1)(c). The video footage clearly demonstrates probable cause for the initial traffic stop and forecloses any claim of a constitutional violation as to the troopers' decision to stop the SUV.[4]

### ii.    *Mr. Larriett's Detention for Field Sobriety Tests*

Mr. Larriett next seems to challenge his detention for field sobriety tests following his stop. This aspect of Mr. Larriett's claim asks whether the officers had reasonable suspicion that Mr. Larriett was driving under the influence to continue the stop and perform field sobriety tests. *See Green*, 681 F.3d at 860. Reasonable suspicion "requires specific and articulable facts, which, taken together with rational inference for those facts, reasonably warrant the continued detention

---

[4] In the briefing, Mr. Larriett also claims that the officers searched his vehicle without his consent in violation of *Arizona v. Gant*, 556 U.S. 332 (2009). (ECF No. 32, PageID.141). Mr. Larriett does not develop this argument in any meaningful way and thus has abandoned any Fourth Amendment claim as to a search of his vehicle. The dash camera footage, moreover, clearly demonstrates that the troopers did not search his SUV. Rather, after arresting Mr. Larriett, the troopers permitted the passenger to park the SUV at the side of the road.

of a motorist after a traffic stop."  *Id.* (quoting *United States v. Ellis*, 497 F.3d 606, 613-13 (6th Cir. 2007)).  Courts are to "'look at the totality of the circumstances of each case to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing,' while bearing in mind that officers are permitted 'to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them." *Id.* (quoting *Ellis*, 497 F.3d at 613).

The totality of the circumstances demonstrates that the two troopers had a particular and objective basis for suspecting that Mr. Larriett was driving under the influence so as to extend the stop to conduct field sobriety tests.  While Mr. Larriett contends the question of whether reasonable suspicion exists turns on disputed facts, the Court finds the video footage clearly and blatantly contradicts his allegations in several respects and demonstrates that reasonable suspicion existed for the troopers to extend the stop to perform field sobriety testing.

Trooper Kanyuh provided the following reasons for detaining Mr. Larriett for field sobriety tests: Mr. Larriett failed to come to a complete stop when performing a right-hand turn at a red traffic light; the trooper smelled a "fruity" aroma coming from the SUV while asking Mr. Larriett for his paperwork; and Mr. Larriett admitted to alcohol consumption before changing his story. The Court also finds the time of day—shortly after 3:00 a.m.—relevant to the reasonable suspicion inquiry.

The traffic violation is certainly relevant as part of the totality-of-the-circumstances inquiry too.  *See Green*, 681 F.3d at 864.  But like in *Green*, the Court concludes it does not on its own constitute reasonable suspicion of driver impairment.  Only one violation took place, and while

18

the video clearly depicts that violation, it also shows that the violation was not egregious, that the vehicle slowed down before turning, and that Mr. Larriett remained in control of the vehicle.[5]

The trooper's detection of the scent of alcohol also is patently relevant to reasonable suspicion. *See Bradley v. Reno,* 632 F. App'x 807, 810 (6th Cir. 2015) (reasonable suspicion to detain driver for field sobriety tests based, in part, on officer's detection of alcohol).  But the Sixth Circuit has made clear that where facts are disputed and could vitiate not only a probable cause or reasonable suspicion determination, but also a qualified immunity decision, the factual dispute must be left to a jury. *See Akima v. Peca,* 85 F.4th 416, 425 (6th Cir. 2023).  So where the results of a blood test could call into question the credibility of an officer's statements about the scent of alcohol, or other indicia of intoxication that are difficult, if not impossible, to capture on video tape, the Sixth Circuit has generally placed the decision in the hands of the jury. *See id.*; *see also Miller v. Sanilac County*, 606 F.3d 240 (6th Cir. 2010); *Green v. Throckmorton*, 681 F.3d 853 (6th Cir. 2012).  But see *Kinlin v. Kline*, 749 F.3d 573 (6th Cir. 2014) (scent of alcohol undisputed). Mr. Larriett contends he did not consume alcohol, and he avers his passenger can confirm as much. (First Larriett Aff. ¶ 4, ECF No. 1-1, PageID.11).   Accordingly, the Court does not consider the trooper's detection of alcohol here.[6]

What remains is the trooper's contention that Mr. Larriett admitted to consuming alcohol and then changed his story.  Mr. Larriett argues that this consideration does not add anything to

---

[5] To be specific the trooper referenced two instances in which Mr. Larriett had failed to come to a complete stop at a traffic light.  Mr. Larriett disclaims committing any violation; and the dash camera footage blatantly contradicts Mr. Larriett only as to one violation.  Accordingly, the Court considers only one moving violation in the totality of the circumstances analysis.

[6] Notably Mr. Larriett does not claim whether his passenger had consumed alcohol or not—something the trooper later mentioned he was trying to ascertain during this initial stop.  Given that the troopers subsequently permitted the passenger to drive the vehicle, however, the Court concludes there is still a disputed fact as to whether the trooper smelled alcohol in the vehicle.

the mix because there is a way to view his remarks to the trooper as consistent.  He faults the trooper for introducing an allegedly misleading two-hour qualification.  The Court views this as presenting a close call but is satisfied that a reasonable officer would understand Mr. Larriett's responses to be evasive and inconsistent.  Trooper Kanyuh's body camera footage reflects that Mr. Larriett promptly responded to the trooper's questions up until the point where the trooper asked when Mr. Larriett had last had a drink.  Indeed Mr. Larriett did not respond to that question, and so the trooper followed up by asking if it had been at least two hours.  Mr. Larriett responded in the affirmative, but then did not directly respond to the officer's subsequent questions about what type of drink Mr. Larriett had—instead repeatedly asserting that there was no alcohol.  This may have turned out to be true, but it does not defeat the inference that a reasonable officer would have drawn from what Mr. Larriett had communicated: that Mr. Larriett had implicitly agreed that he had consumed alcohol at some point more than two hours earlier in the day and then changed his story to state that he had not consumed any alcohol.[7]

At bottom, given the late hour, the traffic violation, and Mr. Larriett's responses to Trooper Kanyuh's questions of alcohol consumption, the Court concludes that the trooper had reasonable suspicion to extend the stop and perform the field sobriety tests.  Accordingly, the troopers are entitled to qualified immunity on this part of Mr. Larriett's Fourth Amendment claim because no constitutional violation occurred.

---

[7] In the briefing and in his affidavits, Mr. Larriett alludes to a possible explanation for his behavior—as a gay man he was taken aback by the officer's reference to a "fruity" smell that he perceived to be a derogatory reference to his sexual orientation.  But Mr. Larriett does not develop this argument or explain how this consideration would defeat the officers' reasonable suspicion.

### iii.    Arrest and Detention

The next decision point that Mr. Larriett challenges is his arrest and detention until his release around noon later that day.  Again these false arrest and imprisonment claims arise under the Fourth Amendment.  A plaintiff can establish a constitutional violation on these claims when an "officer effects a warrantless arrest without probable cause."  *Akima*, 85 F.4th at 422-23. "Probable cause exists if a person of 'reasonable caution,' considering 'the facts and circumstances within' the officer's knowledge, would 'believe that an offense had been, was being, or was about to be committed.'"  *Id.* at 423 (quoting *Hartman v. Thompson*, 931 F.3d 471, 481 (6th Cir. 2019)). Like reasonable suspicion, courts consider the totality of the circumstances and look "to both 'the evidence of guilt' and the 'exculpatory evidence' available to the officer at the time."  *Id.* (quoting *Ouza v. City of Dearborn Heights*, 969 F.3d 265, 279 (6th Cir. 2020).  "This evidence is viewed under an objective standard without considering 'the arresting officer's actual motives."  *Id.* (quoting *Kinlin*, 749 F.3d at 579-80).

The defendant troopers contend they are entitled to qualified immunity because they had probable cause to arrest Mr. Larriett under Michigan's "operating while intoxicated" law.   To be specific, the defense contends the troopers had probable cause to arrest Mr. Larriett for operating under the influence of a controlled substance.  (ECF No. 20, PageID.72).  In relevant part, Michigan law prohibits "'operating while intoxicated,' defined as driving (1) 'under the influence of' an 'intoxicating substance,' or (2) with a bodily 'alcohol content of 0.08' or more."  *Akima*, 85 F.4th at 425 (quoting MICH. COMP. LAWS § 257.625(1)).

The indicia of possible intoxication available to the two troopers at the time of Mr. Larriett's arrest include those that contributed to reasonable suspicion—the time of day, the traffic violation, and Mr. Larriett's comments regarding alcohol consumption.  Before the two troopers

decided to arrest Mr. Larriett they also met and conferred about two additional details: (1) their personal observations of Mr. Larriett; and (2) the results of the field sobriety tests.  Both troopers remarked that Mr. Larriett appeared distracted, and Trooper Kanyuh commented about a lack of smooth pursuit when Mr. Larriett was asked to follow his finger.  Trooper Kanyuh further discussed the results of the field sobriety tests.  As he later told Mr. Larriett, these were not pass or fail tests, but the results satisfied the trooper that Mr. Larriett was impaired.  Mr. Larriett disagrees with the troopers' assessment and contends that he did pass the testing.  The video recordings do not clearly depict the full view of the field sobriety tests and the various nuances that the trooper observed, although rapid eye blinking is apparent on the video.  But what is clearly depicted is that Mr. Larriett stopped well short when asked by Trooper Kanyuh to count down backwards from 99 to 81—something the trooper singled out during his discussion with Trooper Okaiye.  Based on this record, the Court is satisfied that the only reasonable determination here is that the troopers had probable cause to arrest Mr. Larriett,

But even if there is some room for dispute on this point, it does not defeat qualified immunity on this record because "a lack of probable cause is not necessarily fatal to an officer's defense against civil liability for false arrest."  *Green*, 681 F.3d at 865.  "[A]n officer is entitled to qualified immunity under § 1983 'if he or she could reasonably (even if erroneously) have believed that the arrest was lawful, in light of clearly established law and the information possessed at the time by the arresting agent.'"  *Id.* (quoting *Parson v. City of Pontiac*, 533 F.3d 492, 501 (6th Cir. 2008).  An accounting must also be made for the "'exculpatory evidence' a reasonable officer would have discerned."  *Akima*, 85 F.4th at 429 (citing *Ouza*, 969 F.3d at 279).  Applied to this case, the Court concludes the troopers are entitled to qualified immunity even if probable cause was lacking.  Given the information they had at the time—the time of day; traffic violation;

22

comments about alcohol consumption; and performance on field sobriety tests, there was sufficient inculpatory information that a reasonable officer in the trooper's circumstances could have concluded there was probable cause to arrest Mr. Larriett for driving while intoxicated.  To be sure, the traffic infraction was minor and throughout the interaction Mr. Larriett did not appear to be out of control or have slurred speech.  But those considerations are not enough, in the Court's mind, to vitiate probable cause or qualified immunity.

Mr. Larriett offers two further arguments to resist this conclusion.  First, he contends that it was a cold morning, and he was wearing thin clothing.  But "'[o]ften, innocent behavior will form the grounds for probable cause.'"  *Green*, 681 F.3d at 865 (quoting *United States v. Wright*, 16 F.3d 1429, 1438 (6th Cir. 1994)).  Probable cause is "'based on an examination of all facts and circumstances within an officer's knowledge at the time of an arrest.'"  *Id.* (quoting *Crockett v. Cumberland Coll.*, 316 F.3d 571, 580 (6th Cir. 2003)).  Mr. Larriett does not explain why the officers had any reason to know cold conditions could affect his performance on the sobriety tests in any meaningful way beyond that readily known to a reasonable officer because he never told them he was cold.

But in the main, Mr. Larriett contends that probable cause did not exist to arrest him because, he believes, the two troopers wanted to plant drugs in his vehicle.  He bases this belief on the interaction between Troopers Kanyuh and Okaiye after the field sobriety tests; the utterance of "drugs" that he says Trooper Okaiye made; and Trooper Kanyuh's response that he couldn't find any but thought he had a "stash" somewhere.  Tacitly acknowledging the defense argument that the troopers were searching for "straws"—part of a portable breath alcohol test—Mr. Larriett contends that it makes no sense that a trooper would search through the trunk of his vehicle for those materials or refer to materials as part of a "stash."  This argument is not persuasive.  To

begin, Mr. Larriett was not arrested for possession of drugs; rather he was arrested for driving while intoxicated.  Thus this argument does not touch on whether officers had probable cause to arrest him for that offense.  Moreover, the allegations are blatantly contradicted by the video footage.    Both troopers' body camera footage reflect that Trooper Okaiye clearly and unambiguously asked Trooper Kanyuh about "straws."  Mr. Larriett speculates that it would not make sense to bury those materials in the trunk of a patrol vehicle, but the video also shows the trooper searching through the other areas of the vehicle before looking in the trunk.  Accordingly, this argument does not disturb the Court's conclusion that the troopers are entitled to qualified immunity on this part of Mr. Larriett's Fourth Amendment claim.

In the briefing, Mr. Larriett makes scant references to subsequent events—his blood draw tests; time in detoxication; and amount of time it took to return his driver's license after he was released.  These arguments, albeit not contained in the Complaint, suggest a claim that Mr. Larriett's Fourth Amendment rights were violated when he was detained after subsequent events dissipated any suspicion that Mr. Larriett was not sober.  Continued detention without probable cause can be a Fourth Amendment violation.  *Jones v. Clark Cnty.*, 959 F.3d 748, 759 (6th Cir. 2020), *abrogated on other grounds by Thompson v. Clark*, 596 U.S. 36 (2022).   But the undeveloped argument here fails to allege a Fourth Amendment violation.  As to the blood draw, Michigan is an implied consent state.  *See* MICH. COMP. LAWS § 625c.  Michigan law further provides that after being arrested, a refusal to take a test when requested results in license suspension and the addition of six points to the driver's record.  *See* MICH. COMP. LAWS § 625a(6)(b)(v).  The video here demonstrates that Mr. Larriett was informed of all this and agreed to the blood draw.  The Court finds that Mr. Larriett fails to allege a Fourth Amendment violation as to the blood draw.  As to his time in "detox" the video evidence clearly shows that Mr. Larriett

was informed that he would be required to spend time in detox even if he agreed to the blood draw. It appears that Mr. Larriett contends that at some point he was informed—and thus the officers knew—that he had passed an alcohol test and nonetheless was required to stay for an undescribed period of time until his release later around noon.  Assuming the defendant officers could be liable for the events that transpired while Mr. Larriett was in detox the problem with this argument is that it fails to address the troopers' belief that a combination of substances—alcohol, marijuana, and medication were impairing him.  As a general matter, a state "has an interest in protecting the public from the intoxicated and the intoxicated from themselves." *Anaya v. Crossroads Managed Care Systems, Inc.*, 195 F.3d 584, 591 (10th Cir. 1999).  "However, once a reasonable officer actually does ascertain beyond reasonable doubt" than an arrestee for intoxication "is in fact not intoxicated, the arrestee should be released." *McConney v. City of Houston*, 863 F.2d 1180, 1185 (5th Cir. 1989).  Because Mr. Larriett has not alleged that he was detained beyond the point when officers knew he was not intoxicated, he fails to allege a Fourth Amendment violation, and the troopers are also entitled to qualified immunity here.

For all these reasons, the Court concludes the trooper defendants are entitled to qualified immunity on Mr. Larriett's Fourth Amendment claims.

## II.      Qualified Immunity – Fourteenth Amendment

Mr. Larriett's other Section 1983 claim, raised in Count II, is that he was targeted by the two troopers because of his race and sexual orientation, in violation of his Fourteenth Amendment equal protection rights.  The defense argues that Mr. Larriett has failed to allege all the requisite elements of such a claim, and that the troopers are entitled to qualified immunity.  The defense argument has merit.

"[B]ecause the Equal Protection Clause provides protection from constitutionally unequal treatment independent of the Fourth Amendment's protection against unreasonable searches and seizures, the existence of probable cause to search and arrest . . . does not perforce dispose of [a] Fourteenth Amendment claim." *Cunningham*, 136 F. App'x at 774 (citing *United States v. Avery*, 137 F.3d 343, 352 (6th Cir. 1997)). Rather a plaintiff can establish a Fourteenth Amendment claim of selective enforcement under Section 1983 by demonstrating "'purposeful discrimination' in the officers' otherwise valid enforcement" of the laws against him. *Id.* (citing *Gardenhire v. Schubert*, 205 F.3d 303, 319 (6th Cir. 2000)). To state a claim of selective prosecution, a plaintiff must demonstrate three elements: "First, [the state actor] must single out a person belonging to an identifiable group . . . for prosecution even though he has decided not to prosecute persons not belonging to that group in similar situations. Second, he must initiate the prosecution with a discriminatory purpose. Finally, the prosecution must have a discriminatory effect on the *group* which the [plaintiff] belongs to." *Rieves v. Town of Smyrna*, 959 F.3d 678, 700 (6th Cir. 2020) (quoting *Stemler v. City of Florence*, 126 F.3d 856, 873 (6th Cir. 1997)).

There can be no dispute that as a Black and gay man, Mr. Larriett belongs to an identifiable group for Equal Protection purposes. However, he fails to make out a *Twombly* plausible claim with respect to the rest of the elements. Mr. Larriett's basic contention appears to be that he has alleged enough to demonstrate the trooper's subjective motivations for the stop. He claims that the troopers had no logical reason to stop, detain, and arrest him so the troopers must have intended to discriminate against him on account of his race and sexual orientation. He further points to isolated phrases from the recordings: the troopers' initial comments regarding the SUV's vanity license plate before performing the stop and Trooper Kanyuh's use of the word "fruity" when describing the scent he observed in the context of inquiring about Mr. Larriett's alcohol

consumption.  And he points to various screenshots of what he says are posts on a social media account controlled by Trooper Kanyuh.  There are myriad problems with these arguments.  For one thing, the video exhibits clearly show the troopers—one of whom is also Black—did have a legitimate reason for the stop.  And with respect to the social media posts, they are "riddled with evidentiary issues."  *See Webb v. Davis*, 648 F. Supp. 910, 924 (E.D. Tenn. Dec. 30, 2022) (addressing similar contention in selective enforcement claim).  In *Webb*, a plaintiff alleged that certain social media posts were allegedly made by the defendant officer demonstrated racial animus to support a selective enforcement claim.  The court found the plaintiff had not established the accounts were in fact controlled by the defendant officer and that the complained of postings were temporally remote from the events of the case.  The court determined that the plaintiff had not established a connection between the posts and his arrest, even assuming the posts were admissible.  *Id.*  The same is true here.

The overarching problem, however, is that all these arguments as to the trooper's subjective motivations go only towards the second element of a selective enforcement claim.  *Cunningham*, 136 F. App'x at 775.  Mr. Larriett fails to allege sufficient facts that would demonstrate he meets the other two elements.  With respect to the first element, "it is an absolute requirement that the plaintiff make at least a *prima facie* showing that similarly situated persons outside [his] category were not prosecuted."  *Id.*  (citing *Gardenhire*, 205 F.3d at 319).  But there is nothing proffered either in the Complaint or in the briefing that would suggest that similarly situated people (red light runners) of different races or sexual orientations were treated differently in terms of stops or arrests.  Furthermore Mr. Larriett has failed to allege any facts that relate to the third element of the claim—that there was a discriminatory effect on the groups to which he belongs.  Accordingly,

he fails to state a claim with respect to a Fourteenth Amendment violation and so the two troopers

are entitled to qualified immunity on this claim.

## B.  Section 1981 Discrimination Claim

The remaining federal claim is Mr. Larriett's contention in Count III that the two troopers

violated his right to be free from racial discrimination and intentionally discriminated against him

based on his race in violation of Section 1981.[8]  That provision states that "all persons within the

United States 'shall have the same right in every State . . . to the full and equal benefit of all laws

and proceedings for the security of persons and property as is enjoyed by white citizens, and shall

be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to

no other.'"  *Cunningham*, 136 F. App'x at 775 (quoting Section 1981(a)).  "Section 1981(c)

protects those rights against impairment by nongovernmental discrimination and impairment under

color of state law."  *Id.* (internal quotation marks omitted).  And "to establish a Section 1981 claim,

a plaintiff must show (1) that he is a member of a racial minority, (2) that the defendant acted with

an intent to discriminate against him on the basis of his race and (3) that the defendant's race

discrimination concerned one or more of the protected activities enumerated in Section 1981(a)."

*Id.* (citing *Morris v. Office Max, Inc.,* 89 F.3d 411, 413 (7th Cir.1996)).

"Though Section 1981 on its face relates primarily to racial discrimination in the making

and enforcement of contracts, some other Courts of Appeals have held that racially motivated

arrests and searches made in the absence of probable cause come within *Morris*' third requirement

---

[8] Mr. Larriett also alleges that he has a cause of action under this statute for discrimination based
on sexual orientation.  However, "the plain language of § 1981 establishes that the section is
limited to race discrimination. It does not provide a remedy for sexual orientation discrimination."
*Burks v. Eiseman*, No. 2:18-CV-00075, 2020 WL 1234935, at *3 (W.D. Mich. Mar. 13, 2020).
Even if it were otherwise, however, Mr. Larriett fails to allege facts that would meet the high
threshold of proof necessary show the two troopers were motivated by an intent to discriminate
against him because of his sexual orientation.

because they fall within the 'equal benefits' and 'like punishments' clauses of Section 1981(a)." *Id.* (internal citation and quotation marks omitted). The video exhibits blatantly contradict any suggestion that the initial decision to pull over the SUV was motivated by an intent to discriminate against Mr. Larriett because he was Black. The SUV was directly ahead of the troopers, and there is no allegation that the troopers were aware of Mr. Larriett's race before the stop. As to the subsequent events, Mr. Larriett cannot demonstrate a racially motivated false arrest because—as set out above—there was probable cause for his arrest. The video exhibits, furthermore, blatantly contradict any allegation that Mr. Larriett was treated in a hostile manner because of his race during the stop. There is nothing that would suggest the troopers used any racial epithets or uttered any racially abusive or derogatory statements during the entirety of the complained of events. To the contrary, the video demonstrates such statements were not made. *C.f. Alexis v. McDonald's Restaurants of Massachusetts*, 67 F.3d 341 (1st Cir. 1995) (where probable cause existed to arrest the plaintiff, statement uttered during the arrest that could be construed as racist was sufficient to preclude dismissal of Section 1981 claim). At bottom, Mr. Larriett makes vague, conclusory allegations that he is a victim of racial profiling and selective enforcement without alleging facts that are probative of the discrimination. Because the video exhibits blatantly contradict his conclusory allegations to the contrary, he fails to allege a *Twombly* plausible Section 1981 claim.

## CONCLUSION

Law enforcement officers sometimes get it wrong. That seems to be what happened here when Mr. Larriett was arrested for intoxicated driving even though he was sober. Getting it wrong, however, does not as a matter of course rise to the level a constitutional violation. The officers indisputably had a valid basis for the initial traffic stop. And their subsequent interactions with Mr. Larriett—all of which are captured on videotape—reveal a reasonable, albeit ultimately

mistaken, belief that Mr. Larriett was driving under the influence of some combination of substances.  The video also shows beyond doubt that the officers treated Mr. Larriett with respect throughout the encounter, completely undercutting his theory of racial or sexual orientation animosity.

Mr. Larriett understandably wishes that the night had worked out differently so that he could have continued on his way rather than spend several hours in a detox cell.  Video exhibits, however, blatantly contradict his claims that he committed no traffic infraction; that there was no probable cause for his arrest; and that the troopers acted with discriminatory intent.  Consideration of the video record along with the other matters of record demonstrates that Mr. Larriett falls short of alleging a *Twombly* plausible constitutional violation that defeats the trooper's reliance on qualified immunity.

**ACCORDINGLY, IT IS ORDERED:**

1. The Court **declines** the exercise of supplemental jurisdiction over the state law claims in Counts IV, V, and VI.  Those claims are **DISMISSED WITHOUT PREJUDICE.**

2. Defendants' Motion to Dismiss (ECF No. 19) is **GRANTED** as to the federal claims in Counts I, II, and III.

3. This case is **DISMISSED.**  A separate Judgment shall enter.


Dated:   March 25, 2025          /s/ Robert J. Jonker
                                 ROBERT J. JONKER
                                 UNITED STATES DISTRICT JUDGE